J-S40027-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSEPH A. FLOWERS | : | |
| | : | |
| Appellant | : | No. 105 WDA 2019 |

Appeal from the Judgment of Sentence Entered December 11, 2018
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0001077-1999

BEFORE:   BENDER, P.J.E., McLAUGHLIN, J., and PELLEGRINI*, J.

MEMORANDUM BY McLAUGHLIN, J.:                FILED OCTOBER 11, 2019

Joseph Flowers appeals the judgment of sentence imposed after he was

resentenced pursuant to Montgomery v. Louisiana, 136 S.Ct. 718 (2016),

and Miller v. Alabama, 567 U.S. 460 (2012). We affirm.

On October 7, 1999, a jury found Flowers guilty of murder in the first-

degree, Aggravated Assault, Firearms Not to be Carried Without a License,

and Person Not to Possess Firearm for shooting two men, one of whom died.[1]

Flowers was 17 years old at the time. The facts giving rise to these convictions

are as follows:

> The evidence established that on January 5, 1999, [Flowers] was
> staying at Apartment 57G in the Crawford Village Apartments in
> McKeesport. He was supposed to meet a Tara Evans there.

_____

* Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a), 2702(a), 6105, and 6106, respectively.

Evan[s]' boyfriend, Carlos Bray, went to apartment 57 G [sic] to confront [Flowers] over his involvement with Evans. Bray was accompanied by his cousin, Michael Bray. Neither was armed. The Brays entered the apartment and [Flowers] retreated to the kitchen. When Carlos Bray entered the kitchen, [Flowers] shot him. After Bray fell to the floor, [Flowers] shot him again.

When Michael Bray turned and tried to flee the apartment, [Flowers] stepped over the body of Carlos Bray, knelt, aimed and shot Michael Bray in the back. [Flowers] fled the apartment and was arrested a short time later. He gave a statement to Detective James Morton in which he admitted that he shot Carlos and Michael Bray but claimed that he did so in self-defense. [Flowers] did not testify at trial or present any other evidence.

Commonwealth v. Flowers, 828 A.2d 396 (Pa.Super. filed April 23, 2003) (unpublished memorandum) (quoting trial court opinion). The trial court imposed a mandatory life sentence without parole for the first-degree murder conviction. We affirmed the judgment of sentence. See id.

Flowers filed a pro se Post Conviction Relief Act ("PCRA") petition seeking relief under Miller and Montgomery. See 42 Pa.C.S.A. §§ 9541-9546. Miller held "that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" Miller, 567 U.S. at 465. Montgomery held that "Miller announced a substantive rule that is retroactive in cases on collateral review." Montgomery, 136 S.Ct. at 732. The PCRA court vacated Flowers' judgment of sentence and scheduled a resentencing hearing. See Order of Court, filed 5/9/17.

At the resentencing hearing, Flowers presented testimony from a mitigation specialist, Bianca D'Auria, as well as testimony from his mother and aunt. Flowers also testified.

D'Auria testified that she had written a report after interviewing Flowers three times, speaking with his family, and reviewing his records from the Department of Corrections, the Office of Children, Youth and Family Services, and juvenile court. N.T., Resentencing Hearing, 12/11/18, at 5. The court accepted her report into evidence. Id. She did not testify as an expert but rather, in defense counsel's words, as a "specialist" who had "talk[ed] to people, review[ed] records, [and] put together a report so the Judge [would] have a picture of [Flowers'] past, his present, [and] what happened around the time of the crime." Id. at 6.

In her report, D'Auria wrote that in coming to a conclusion regarding Flowers' mitigation she considered multiple factors: the impact on the victim(s); the impact on the community; his degree of culpability; his age at the time of the offense; his mental capacity at the time of the offense; his maturity, the "criminal sophistication," notably that he had no prior violent offenses; the "nature and extent of prior delinquent/criminal history"; and his "amenability to treatment/potential for rehabilitation/reduction of threat to the safety of the public or others." See Mitigation Report, filed 6/04/18, at 16-18.

Regarding Flowers' potential for rehabilitation, she concluded the following:

[Flowers] has spent the last 19 years of his life incarcerated. He has remained misconduct free since 2014. None of his misconducts have been violent in nature. [Flowers] has participated [in] many classes such as Stress and Anger Management and Character Development that have helped him to grow as an individual and prepare for release. [Flowers] continues to set goals for himself to continue his growth. He takes time to read and expand his knowledge of Physics and other topics. [Flowers] also takes lessons from his time in the juvenile system and he applies them to his current relationships. He continues to demonstrate a desire and motivation to grow.

Id. at 18.

The report then ends with the following quote from Flowers:

I'm glad I had to serve time. The way I though[t] back then I would have felt like I got over. It would have boost[ed] my ego on a bad level. Doing the time put into perspective the value of life, not just mine, everyone's. It took the first ten years to get to the point to be able to take responsibility, to get to the point of self-reflection. I have to take responsibility for my own actions. I can't expect everything to go right without putting in the work.

Id.

Next, the court heard testimony from Flowers' mother, Jacqueline Miles. She testified about being addicted to drugs when Flowers was a child and as a result not being consistently present in his life. N.T., Resentencing, at 18. She also testified that while he knew the identity of his father, his father "just didn't have the time" for him. Id. at 19. She also testified that she began to see a change in Flowers after approximately four to five years in prison.

[Miles]: Around 2003, 2004 we started really talking. Then he started around maybe – it's kind of hard to keep up with the years since there's been a whole lot of them, you know. But eventually

- 4 -

we started talking about what happened around that time and that day. And, you know, he told me then he realizes that none of that would have ever happened had he been where he was supposed to be in school that day. And he has always had remorse for the situation, he always spoke about it. He even asked me at one point, "Mom, could you please reach out to that family just to see if there's anything we can do?" I said, "Wait, you're locked up" but I know what he meant, and I made that effort. . . . But like I said, he's a different person now.

Id. at 20, 21-22.

The court then heard testimony from Flowers' aunt, Cynthia Norfleet-Jackson, who also testified about the difference she had seen in Flowers since his incarceration.

[Jackson]: . . . Now since [Flowers'] incarceration and everything, we started back writing around 2004 and in 2006 was when I made my actual visit with him up to Somerset. At first, it was like, "I'm tired of this place but I know what I did, you know, I wish I would have thought differently had I been in the right please instead of where I was, but I'm willing to deal with this situation here but I don't like it here." . . . I have been to Somerset and I have been to Houtzdale where he is at now. Somerset, I could see the growth. He wasn't looking at it like, "okay, I don't have to be here forever. I'm going to focus on what I can do to be a better person." And I would take my grandsons, I have two grandsons that I'm raising. And [Flowers] would counsel with them as well and let them know that this is not a place they wanted to be. They didn't need to associate themselves with gangs or anything like that. Don't let peer pressure bother them, stay in school.

Id. at 23, 25-26.

Finally, the court then heard testimony from Flowers. Flowers expressed his remorse for the crime and discussed the change in his life during these last twenty years of being incarcerated.

[Defense Counsel]: How do you feel you have changed since your teenage years, since the day this happened up until today?

[Flowers]: One of the biggest changes I think I've made is I'm more secure in myself. Instead of counting on how everybody else looks at me, they are going to think that's cool or whatever, I choose to walk my own path because in the end I have to pay for whatever I do, I have to pay for my own consequences. So I can't base my actions, my decisions on how you feel or how you think.

Over the years, I found that pretty much walking in a circle or banging my head against the same wall, doing the same behavior is called insanity. It's repeating the same behavior and getting the same results. That hasn't been successful, so I started finding ways to find positive things to do, positive people to be around. I take it upon myself to further my education. I would get books from Books Through Bars, they give free books.

[Flowers]: Then another thing as far as my personal growth. I don't like to blame because for anything else anymore.

* * *

[Defense Counsel]: And the transformation that you put yourself through helped you get through the last 20 years, that again was long before you knew there was a chance you were going to get out one day.

[Flowers]: Yes. When you are first going though and you're going through SCI Camp Hill, they give prescription programs that they feel you should take based on many factors but mainly dependent on your charges and so on. I got in the classes as soon as I was able to, because going home or not, why not better myself? So I took the programs immediately. I continued seeking programs. . . . Then another thing as far as my personal growth. I don't like to blame people for anything else anymore.

* * *

[Defense Counsel]: Okay. I'm sure you thought about what happened that day in 1999. What are your thoughts about what happened how [do] you feel about it?

[Flowers]: That's the most tragic day in my history. Not necessarily of what happened to me but because of the wide-range effect that it took on others. A young man lost his life. That life that was extinguished can never be brought back and I feel

horrible about it. The fact that his family had to endure the hardship, whether it be something as simple as missing him or him not being able to be there to support them through things. That weighed heavily on me day-to-day and then the effect it had on the families.

* * *

[Defense Counsel]: Is there anything else you would like to [sic] the Judge to know?

[Flowers]: That I'm extremely sorry. I mean, if they were here today I would love to tell them how sorry I am and if there was ever any way they could think of that I could repay them, I owe them eternally.

Id. at 29-30, 32, 33-34.

At the conclusion of the hearing, the court resentenced Flowers to concurrent terms of 30 years' incarceration to life imprisonment for the first degree murder conviction and five to 10 years' incarceration for the aggravated assault conviction, with credit for time served. Id. at 46; see also Order of Sentence, dated 12/11/18. Flowers filed a post-sentence motion, which the court denied. This timely appeal followed.

Flowers raises the following claim:

> I. The trial court erred in re-sentencing [Flowers] since [Flowers'] minimum sentence of 30 years imprisonment for murder 1 was manifestly excessive since this was essentially a murder 3 case ([Flowers] was confronted by both victims, who came to violently confront appellant rather than having a peaceful discussion) and [Flowers] was a frightened, 17 year old, [Flowers] has served 20 years state imprisonment and is now a responsible, mature, levelheaded, remorseful, 37 year old man, who has spent his 20 years incarcerated attempting to make himself a more productive and better human being, is no longer a threat to society, and there is no reason to believe that he should have to spend at least

10 more years incarcerated, at taxpayer expense, to pay for crimes and be rehabilitated to the point that he could be reintegrated into society; hence, the minimum sentence of 30 years imprisonment was manifestly excessive.

Flowers' Br. at 8.

Flowers' claim challenges the discretionary aspects of his sentence. As such, we must first determine whether: "(1) the appellant preserved the issue either by raising it at the time of sentence or in a post[-]sentence motion; (2) the appellant filed a timely notice of appeal; (3) the appellant set forth a concise statement of reasons relied upon for the allowance of his appeal pursuant to Pa.R.A.P. 2119(f); and (4) the appellant raises a substantial question for our review." Commonwealth v. Conte, 198 A.3d 1169, 1173 (Pa.Super. 2018) (citation omitted) (alteration in original).

Flowers has satisfied the first three prongs. We now address whether he has raised a substantial question. Flowers argues "that his 30 year minimum sentence was manifestly excessive." Flowers' Br. at 12. He notes that we have found substantial questions to be raised "when the claim of excessiveness is that the sentence is so manifestly excessive as to constitute too severe a punishment[,]" and where "the [t]rial [c]ourt did not provide sufficient reasons for the excessive sentence[.]" Id. (citing Commonwealth v. Mouzon, 812 A.2d 617 (Pa. 2002), and Commonwealth v. Wilson, 946 A.2d 767 (Pa.Super. 2007)). However, Flowers does not argue that the sentence created too severe a punishment or that the court did not provide the reasons for its sentence. Without further explanation as to why such a

sentence is excessive, he has failed to raise a substantial question. Nonetheless, if he had raised a substantial question, we would conclude that the claim lacked merit.

We review an appeal from the discretionary aspects of sentence for an abuse of discretion. See Commonwealth v. Nevels, 203 A.3d 229, 247 (Pa.Super. 2019) (citing Commonwealth v. Cook, 941 A.2d 7, 11-12 (Pa.Super. 2007)). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." Commonwealth v. Santos, 176 A.3d 877, 882 (Pa.Super. 2017) (quoting Commonwealth v. Antidormi, 84 A.3d 736, 749-50 (Pa.Super. 2014)).

In the argument section of his brief, to support his assertion that the court imposed a manifestly excessive sentence, Flowers discusses the mitigation evidence he presented at the sentencing hearing as well as his opinion that the crime he committed "in reality [was] a Murder 3." Flower's Br. at 13.

To begin, we reject Flowers' argument that the crime committed herein was "in reality a Murder 3," as it denies the jury's verdict. Flowers was charged and convicted of murder in the first degree, a verdict of which this Court affirmed. See Flowers, No. 1170 WDA 2000 at 1.

Flowers notes his mitigating factors included his bleak upbringing (absent father and drug addicted mother), his age at the time of the shooting, the confrontational nature of the shooting, his continuous remorse, and his noted good behavior while incarcerated. A review of the resentencing hearing reflects that the trial court considered these mitigating factors in fashioning its sentence.

The court read the extensive report of D'Auria and also heard testimony from Flowers' mother and aunt, as well as from Flowers himself. Based on this evidence, "[the] court departed downwards precisely because of the circumstances of the offense and the efforts [Flowers] has made towards preparing himself for reentry into society, efforts that he made when he had no reason to believe that he ever would be paroled." Trial Court Opinion, filed 5/02/19, at 5.

Furthermore, the current sentencing statute for juveniles, Section 1102.1(a)(1), requires that a juvenile 15 years of age or older convicted of first-degree murder be sentenced to a minimum of 35 years' incarceration to life. See 18 Pa.C.S.A. § 1102.1(a)(1). While the court was not bound by Section 1102.1(a)(1), we find it persuasive that the court imposed a sentence that is five years less than what sentence it could have imposed had Flowers' committed the same crime today. See id. ("A person who has been convicted after June 24, 2012, of a murder of the first degree, . . . shall be sentenced to a term of life imprisonment . . . the minimum of which shall be at least 35

years to life") (emphasis added). The court's sentence was not manifestly excessive. See Commonwealth v. Foust, 180 A.3d 416, 441 (Pa.Super. 2018) (affirming judgment of sentence following resentencing pursuant to Miller where court imposed two consecutive terms of 30 years to life imprisonment, where evidence existed of defendant's rehabilitation while incarcerated for past 20 years).

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/11/2019